# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ROTEX GLOBAL, LLC,** | : CIVIL ACTION NO. 1:17-CV-2118 |
| Plaintiff | : (Chief Judge Conner) |
| v. | : |
| **GERARD DANIEL WORLDWIDE, INC.,** | : |
| Defendant | : |

## MEMORANDUM

Plaintiff Rotex Global, LLC ("Rotex"), commenced this action asserting that defendant Gerard Daniel Worldwide, Inc. ("Gerard Daniel") infringed U.S. Patent No. 8,261,915 (the "'915 Patent") in violation of 35 U.S.C. § 271. Rotex seeks construction of two claim terms within the '915 Patent. (Doc. 43).

## I. Patent Background & Procedural History

Rotex is the owner of the '915 Patent, which is titled "SCREENING MACHINE AND ASSOCIATED SCREEN PANEL." (Doc. 6 ¶ 8); U.S. Patent No. 8,261,915, at [10], [54], [73]. Rotex began manufacturing and selling screening machines and corresponding screen panels that practice the claims of the '915 Patent in September 2012. (Doc. 6 ¶ 11). Gerard Daniel allegedly sells an infringing screen panel for use in Rotex's patented screening machines. (Id. ¶¶ 12-13). On April 8, 2016, Rotex sent Gerard Daniel a cease-and-desist letter. (Id. ¶ 15). Rotex asserts that Gerard Daniel's screen panel embodies each element of claims 19 through 24 in the '915 Patent. (Id. ¶ 19; see Doc. 6-2). The instant claims construction analysis concerns only terms found in claim 19.

### A. The '915 Patent Generally

The screening machines addressed by the '915 Patent are used to "separate or classify mixtures of solid particles of different sizes" and to separate "solid particles of specific sizes from a liquid in which they are carried." '915 Patent col. 1 ll. 15-20.[1] A screen mounted on a peripheral frame is inserted into a screening machine which then uses "eccentric motors" or other means to create "'vibratory' motion." Id. col. 1 ll. 23-27, 41-50. Over time, several issues with existing screening machines and screen panels became apparent. First, the weight of a screening machine's components and the material being processed (often several hundred pounds), combined with the vibratory motion exerted by the eccentric motors, may "result in significant noise, wear[,] and damage" to both the screen frame and the screening machine. See id. col. 1 l. 51 to col. 2 l. 3. Second, the metal-to-metal contact between the screen frame and the screening machine prevented "screening of very fine material, such as sand." Id. col. 2 ll. 6-12. And third, existing sealing methods were often damaged during installation and engagement of the screening frame. Id. col. 2 ll. 13-20. The invention covered by the '915 Patent seeks to address these issues. Id. col. 2 ll. 31-33.

---

[1] On pages with two columns of text, the '915 Patent provides reference line numbers in increments of five which are not always accurate. See '915 Patent cols. 3-4, 7-8; (see also Doc. 43-3 at 7, 10). Citations to specific line numbers throughout this memorandum opinion correspond to the actual lines of text rather than the reference line numbers.

Figure 1 of the '915 Patent provides a "perspective view of an exemplary screening machine and associated screen panel." Id. col. 3 ll. 14-16.



FIG. 1

Id. fig. 1. The screen panel's peripheral frame is "recessed, offset[,] or beveled relative to the screening surface," thereby allowing it to support a "seal member." Id. col. 2 ll. 43-48. The screen panel (Item 28) is inserted into the screening machine using lining rails that engage the seal member (Item 54) located on the screen panel. Id. col. 2 ll. 57-59. The seal member "closes any gap between the lining rails of the machine frame and the screen panel so that particulate matter cannot escape to the interior components of the screening machine." Id. col. 2 ll. 59-63. Figures 5A through 5E represent a non-exhaustive set of embodiments of seal members to be used with the screen panel. Id. col. 3 ll. 28-29, col. 7 ll. 49-51, 64-66.



Id. figs. 5A-5E.

### B.   Claim 19 of the '915 Patent

Claim 19 of the '915 Patent describes the component parts of the screen panel. See id. col. 9 l. 48 to col. 10 l. 9. The parties identify two terms for construction in claim 19, to wit: "lip" and "adjacent." (See Doc. 42). Claim 19 reads as follows:

> 19. A screen panel for selective insertion into and removal from a screening machine having a machine frame including lining rails permanently attached to the interior thereof, the screen panel comprising:
> a frame;
> a screen material defining a generally planar screening surface and securably attached to the frame, the screen material being pre-tensioned to the frame;
> a peripheral rim extending around at least a portion of the frame; and
> a seal member disposed on the rim for selectively engaging the lining rails of the machine frame of

> the screening machine when the screen panel is
> inserted into the screening machine;
> wherein the cross section of the rim of the screen
> panel has a generally horizontal first portion
> adapted to hold pre-tensioned wire mesh screen
> material, a generally vertical second portion
> integral with and substantially perpendicular to the
> first portion, and a generally horizontal third
> portion substantially perpendicular and integral
> with the second portion;
> wherein the seal member comprises a **lip adjacent** to
> the intersection of the first portion and the second
> portion of the rim, and the lip is adapted to fill the
> void between the machine frame and the screen
> panel when the screen panel is inserted into the
> screening machine.

'915 Patent col. 9 l. 48 to col. 10 l. 9 (emphasis added).

The court convened a claims construction hearing on June 26, 2018, during which both parties presented evidence and argument. The parties thereafter submitted supplemental briefing. The claims construction inquiry is thus ripe for disposition.

## II. Legal Standard

Evaluation of a patent infringement allegation proceeds in two stages. Absolute Software, Inc. v. Stealth Signal, Inc., 659 F.3d 1121, 1129 (Fed. Cir. 2011). An implicated claim must first be "properly construed to determine its scope and meaning." Id. (quoting Carroll Touch, Inc. v. Electro Mech. Sys., Inc., 15 F.3d 1573, 1576 (Fed. Cir. 1993)). Construction of a patent and terms of art therein is "exclusively within the province of the court." Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996); Uship Intellectual Props., LLC v. United States, 714 F.3d 1311, 1313 (Fed. Cir. 2013). The court should look to "the words of the claims

themselves, the specification, the prosecution history, and any relevant extrinsic evidence" in ascertaining a claim's meaning and scope. Absolute Software, 659 F.3d at 1129 (citing Phillips v. AWH Corp., 415 F.3d 1303, 1315-17 (Fed. Cir. 2005) (*en banc*)). The claims as properly construed in step one are then "compared to the accused device or process" at stage two. Id. at 1129 (quoting Carroll Touch, 15 F.3d at 1576).

### III. Discussion

A claim term is generally given its "ordinary and customary meaning," that is, "the meaning that a 'term would have to a person of ordinary skill in the art in question at the time of the invention.'" Howmedica Osteonics Corp. v. Zimmer, Inc., 822 F.3d 1312, 1320 (Fed. Cir. 2016) (quoting Phillips, 415 F.3d at 1312-13). The starting point for construction of a term is the claim in which the term appears as well as other claims within the patent. Phillips, 415 F.3d at 1314-15. A patent's specification "is always highly relevant to the claim construction analysis" and is usually dispositive, id. at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)), but "[s]pecifications teach" and "[c]laims claim," SuperGuide Corp. v. DirecTV Enters., Inc., 358 F.3d 870, 875 (Fed. Cir. 2004) (quoting SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) (*en banc*)). Courts should not import into a claim a limitation that appears in the specification and drawings but that is not a part of the claim. Id.; Gart v. Logitech, Inc., 254 F.3d 1334, 1342-43 (Fed. Cir. 2001). A broad claim should not be limited in its interpretation to a preferred embodiment within the specification. See MBO Labs., Inc. v. Becton, Dickinson & Co., 474 F.3d 1323, 1333 (Fed. Cir. 2007);

Gart, 254 F.3d at 1343 (citing Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 865 (Fed. Cir. 1988)).

A court's interpretation of a technical term using the specification from which the term arose may be "informed, as needed, by the prosecution history." Phillips, 415 F.3d at 1315 (citations omitted). A patent's prosecution history includes the complete record before the United States Patent and Trademark Office ("PTO") as well as any prior art cited during examination of the at-issue patent. Id. at 1317 (citation omitted). The prosecution history can shed light on how the PTO and the inventor understood the patent, but because it represents "an ongoing negotiation . . . rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id. (citations omitted). Whether an inventor limited the invention during prosecution may render a claim's scope narrower than it might otherwise be construed. Id. (citing Vitronics, 90 F.3d at 1582-83).

The language of the claims, the specification, and the prosecution history together constitute intrinsic evidence. Vitronics, 90 F.3d at 1583 (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), aff'd, 517 U.S. 370). When intrinsic evidence is unambiguous, a court should not "rely on extrinsic evidence to contradict the meaning of the claims." Ga.-Pac. Corp. v. U.S. Gypsum Co., 195 F.3d 1322, 1332 (Fed. Cir. 1999), amended on reh'g, 204 F.3d 1359 (Fed. Cir. 2000) (citation omitted); Vitronics, 90 F.3d at 1583. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415

7

F.3d at 1317 (quoting Markman, 52 F.3d at, 980); Vitronics, 90 F.3d at 1583. In the context of claim construction, extrinsic evidence is generally "less reliable than the patent and its prosecution history." Phillips, 415 F.3d at 1318-19. With these principles in mind, we turn to the claim terms at issue *sub judice*.

### A. Proposed Constructions

The parties disagree on the proper construction of "lip" and "adjacent" as these terms appear in claim 19. Claim 19 states in relevant part that "the seal member comprises a lip adjacent to the intersection of the first portion and the second portion of the rim, and the lip is adapted to fill the void between the machine frame and the screen panel when the screen panel is inserted into the screening machine." '915 Patent col. 10 ll. 5-9. Rotex proposes constructing the term "lip" to mean "an edge, or rim, or a projection or protrusion from a surface." (Doc. 42 at 1). Gerard Daniel's desired construction of the term "lip" reads:

> [a] protrusion on a seal member located in a screen panel for a screening machine having a machine frame, the screen panel having a generally horizontal first portion adapted to hold pre-tensioned wire mesh screen material, a generally vertical second portion integral with, and substantially perpendicular to, the first portion, and a generally horizontal third portion substantially perpendicular and integral to the second portion, the protrusion (1) being located adjacent to the intersection of the first portion and the second portion of the rim, (2) being adapted to fill a void between the machine frame and the screen panel when the screen panel is inserted into the screening machine, and (3) helping to cover wire ends of the pretensioned wire mesh screen material.

(Doc. 76 at 1).

As to the term "adjacent," Rotex proffers the following definition: "something is near or next to something else, but they do not have to be in contact with each other." (Doc. 42 at 2). Gerard Daniel posits that "adjacent" should be construed as

> [a]djoining, abutting, and/or having a common endpoint or border with the intersection of the generally horizontal first portion and the generally vertical second portion of the rim extending around at least a portion of the frame, that intersection being the corner of screen panel where the generally horizontal first portion and generally vertical second portion integral with the first portion intersect.

(Doc. 76 at 1-2).[2] Gerard Daniel's proposed constructions of "lip" and "adjacent" substantially track the language of claim 19.

### B. Specification

According to claim 19, the "lip" is "adapted to fill the void between the machine frame and the screen panel when the screen panel is inserted into the screening machine." '915 Patent col. 10 ll. 7-9. The term "lip" is not used in the '915 Patent's specification. Gerard Daniel contends that the only support for the term "lip" in claim 19 is "seal lip" in the patent's specification. (Doc. 76 at 4 & n.1). The "seal lip" (Item 86) is identified only in Figure 5A. '915 Patent col. 7 ll. 52-53.

---

[2] The parties submitted their initial proposed constructions on September 8, 2017, in accordance with the original case management order. (See Doc. 42). In the course of briefing, Gerard Daniel submitted revised constructions of both "lip" and "adjacent," (compare Doc. 42 at 1-2 with Doc. 76 at 1-2), which Rotex urges the court to disregard as untimely, (Doc. 79 at 1-2). We will exercise our discretion and consider Gerard Daniel's revised constructions.



FIG. 5A

Id. fig. 5A.

The "seal lip" "extends to further fill the gap" between the machine frame and the screen panel when the user engages the screen panel with the machine frame. Id. col. 7 ll. 54-57. Gerard Daniel asseverates that the "void" referenced in claim 19 and the "gap" discussed in the specification are "obviously the same." (Doc. 88 at 5-6). The parties have not sought the court's construction of the terms "void" and "gap." Nevertheless, we reach the same conclusion as to the proper scope of the term "lip" regardless of whether "void" and "gap" are construed as identical or distinct terms.

Figure 4A depicts the screening machine when the screen panel is initially inserted. '915 Patent col. 3 ll. 22-24, col. 7 ll. 19-22.



FIG. 4A

Id. fig. 4A. A significant space exists between the seal member (Item 54) and the transition caps (Item 76) which are "permanently sealed to each lining rail" of the machine frame. Id. col. 2 ll. 63-64, col. 7 l. 4. Figure 4B illustrates the screen panel engaged with the screening machine's frame in preparation for operation. Id. col. 3 ll. 25-27.



FIG. 4B

Id. fig. 4B. When the screen panel is engaged, a small triangular space remains unaddressed just above and to the left of the seal member. The "seal lip" depicted in Figure 5A "extends to further fill the gap" between the machine frame and the screen panel when the user engages the screen panel with the screen frame as shown in Figure 4B. Id. col. 7 ll. 52-57.

The '915 Patent's utilization of different terms in describing the vacant space between the seal member and the screening machine's frame suggests that "void" and "gap" should be construed as distinct terms. The term "void" appears to reference the significant space above and to the right of the seal member when the screen panel is inserted but not yet engaged (depicted in Figure 4A). Claim 19

describes the term "lip" broadly so as to cover any protrusion from the seal member designed to fill that "void." *Per contra*, the "seal lip," only present in Figure 5A, seems specifically designed to address a "gap" which is a subsection of the "void" that remains unaddressed by a standard seal member when the screen panel is engaged with the screening machine (depicted in Figure 4B). Moreover, ascribing the definition of "gap" to the term "void" may impermissibly import a limitation not present in claim 19. See SuperGuide, 358 F.3d at 875. Accordingly, the term "lip" is necessarily broader than the term "seal lip."

Assuming *arguendo* that these terms are fungible as Gerard Daniel suggests, (see Doc. 76 at 4 & n.2, 6), equating "void" and "gap" merely establishes that the term "lip" may include, but is not limited to, any "seal lip." By way of example, several of the '915 Patent's embodiments present with "ridges" (Item 88), including Figure 5A. See '915 Patent figs. 5A, 5C-5E, col. 7 l. 62. The "ridges" "assist in improving the overall sealing effectiveness" of the seal member. Id. col. 7 ll. 61-63. The seal member "closes any gap between the lining rails . . . and the screen panel so that particular matter cannot escape into the interior components of the screening machine." Id. col. 2 ll. 59-63. Therefore, the "ridges" may also assist in filling the "void" or "gap." Under this understanding of "void" and "gap," the term "lip" as used in claim 19 is broad enough to encompass the "seal lip" as well as any "ridges."

Gerard Daniel's proposed construction of the term "lip" includes language from the description of the "seal lip" present in Figure 5A, to wit: "helps cover exposed wire ends of mesh screen material." Compare (Doc. 76 at 1) with '915

Patent col. 7 ll. 52-54. The screen panel holds the mesh screen material, '915 Patent col. 4 ll. 54-56, and the "seal lip" abuts up against the edge of the screen panel, see id. fig. 5A. However, the functional limitation placed on the "seal lip"—helping to cover the screen's exposed wire ends—is absent from the language of claim 19. Gerard Daniel seeks to impermissibly import into claim 19 a limitation that is not present therein. See SuperGuide, 358 F.3d at 875; (see also Doc. 88 at 5). Therefore, we cannot adopt the third clause of Gerard Daniel's proposed construction of "lip."

The '915 Patent incorporates by reference several prior patent applications that further support a broad understanding of the term "lip," including U.S. Patent Application No. 11/382,353 (the "'353 Application") and U.S. Patent Application No. 11/295,259 (the "'259 Application"). '915 Patent at [63], col. 1 ll. 6-11. Both the '259 Application and the '353 Application contain a screen panel and associated frame with "beveled edges or lips" (Item 68) which run along two sides of the screen panel frame. (Doc. 43-8 at 12; Doc. 43-9 at 7).



(Doc. 43-9 at 2; Doc. 43-8 at 5). "Beveled lips" are clearly distinguishable in character from a "seal lip" or "ridges." Gerard Daniel's proposed construction of

the term "lip" would exclude "beveled lips" as defined in the '259 Application and the '353 Application.

The broad scope of the term "lip" informs the proper construction of the term "adjacent." Gerard Daniel suggests that the "lip" must share "a common endpoint or border with the intersection of the generally horizontal first portion and the generally vertical second portion of the rim" to be considered "adjacent." (Doc. 76 at 1-2). Figure 3 of the '915 Patent illustrates that the horizontal first portion (Item 58) intersects with the vertical second portion (Item 60) at a right angle. '915 Patent col. 3 ll. 20-21, col. 4 l. 67 to col. 5 l. 3.


FIG. 3

Id. fig. 3. Adopting Gerard Daniel's proposed construction of "adjacent" would limit the scope of the term "lip" to that of the "seal lip" in Figure 5A as the "seal lip" is the only type of "lip" that shares a common endpoint or border with the intersection of the horizontal first portion and vertical second portion.



Id. figs. 5A-5E. Moreover, Gerard Daniel's proposed construction of "adjacent" would exclude alternative embodiments of the screen panel with the seal member represented in Figures 5B through 5E. See id. col. 3 ll. 28-29. A proffered claim interpretation that "excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." MBO Labs., 474 F.3d at 1333 (citation omitted).

The '915 Patent utilizes the term "adjacent" elsewhere in the specification. The fine mesh screen material (Item 34) on the screen panel (Item 28) is "adjacent the inlet port [(Item 12)] through which dust and other fine particulate matter passes for collection and discharge." '915 Patent col. 4 ll. 18-22.

15



FIG. 1

Id. fig. 1 (emphasis added). Only Rotex's proposed construction—"something is near or next to something else, but they do not have to be in contact with each other"—is broad enough to encompass the specification's use of "adjacent" to describe the relative locations of the screen material and the inlet port.

C.    **Prosecution History**

The prosecution history also supports Rotex's proposed constructions. On May 20, 2009, the parent application of the '915 Patent was filed as U.S. Patent Application No. 12/468,937 (the "'937 Application"). Id. at [21], [22]. Gerard Daniel posits that Rotex narrowed the scope of the terms "lip" and "adjacent" during prosecution of the '915 Patent. (See Doc. 88 at 3-4). In reviewing the '937 Application, the PTO rejected claim 9 (now incorporated into claim 19) as "anticipated by" U.S. Patent No. 7,516,851 ("DeCenso"), (Doc. 43-6 at 1, 6), stating:

> DeCenso further teaches wherein the seal member
> comprises a lip adjacent to the intersection of the first
> portion and the second portion of the rim, and the lip is
> adapted to fill the void between the machine frame and
> the screen panel when the screen panel is inserted into
> the screening machine (Fig. 2).

(Id. at 8 (quoting original claim 9)). Original claim 9 was initially premised on an independent claim that was anticipated by DeCenso. (Doc. 75-1 at 16-17). Rotex amended the independent claim and argued that the PTO should therefore withdraw its objection to unaltered claim 9. (Id. at 17-18). The PTO agreed and noted that original claim 9 "would be allowable if rewritten in independent form." (Doc. 23-3 at 11). Gerard Daniel's proposed narrow construction of "lip" finds no support in the prosecution history of original claim 9 because Rotex did not distinguish DeCenso from original claim 9 through amendment thereof. Compare (Doc. 43-6 at 8) with '915 Patent col. 10 ll. 5-9.[3]

The PTO's evaluation of DeCenso's Figure 2 (pictured below) during the '915 Patent's prosecution further counsels in favor of adopting Rotex's proposed constructions of the terms "lip" and "adjacent."

---

[3] Gerard Daniel also avers that claim 14 was rejected as anticipated by, or obvious over, U.S. Patent No. 3,176,843 ("Hoskins"). (Doc. 76 at 7). However, the at-issue language in claim 19 of the '915 Patent was present in original claim 9, rather than original claim 14, and the PTO did not identify original claim 9 as being anticipated or obvious in light of Hoskins. (See Doc. 43-6 at 3-5).



**FIG. 2**

U.S. Patent No. 7,516,851 fig. 2.

DeCenso's Figure 2 is "a housing seal arrangement associated with a material separator." Id. col. 3 ll. 34-35. The terms "seal member," "lip," and "void" do not appear in the DeCenso patent. See '851 Patent. Yet as noted *supra*, the PTO determined that DeCenso's Figure 2 teaches that "the seal member comprises a lip . . . and the lip is adapted to fill the void between the machine frame and the screen panel when the screen panel is inserted into the screening machine." (Doc. 43-6 at 8). The PTO clearly understood that the gasket (Item 40) is comprised of two protrusions (or "lips") which are positioned to fill the void between the cylindrical frames (Items 34 and 36) and the part of the screen frame (Item 30) called the flange (Item 38). See '851 Patent col. 4 ll. 23-38). Only Rotex's proposed construction of

the term "lip" is broad enough to encompass the protrusions of the gasket in DeCenso's Figure 2.

The same is true with respect to DeCenso's use of the word "adjacent." The PTO found DeCenso's Figure 2 teaches that "the rim of the screen panel has a generally horizontal first portion adapted to hold pre-tensioned wire mesh screen material" and "a generally vertical second portion integral with and substantially perpendicular to the first portion." (Doc. 43-6 at 7-8). The PTO also determined that DeCenso's Figure 2 teaches that "the seal member comprises a lip adjacent to the intersection of the first portion and the second portion of the rim." (Id. at 8). Because the horizontal first portion of the screen frame (Item 30) is juxtaposed to the screen cloth (Item 32), see '851 Patent col. 4 ll. 23-28, the protrusions or "lips" of the gasket (Item 40) cannot be understood to touch or share an endpoint or border with the intersection of the screen frame's horizontal first portion and vertical second portion. Yet the PTO clearly understood the protrusions of the gasket to be "adjacent" to that intersection. (Doc. 43-6 at 8). Gerard Daniel's proposed construction of the term "adjacent" directly contradicts the PTO's understanding of that term.

## IV. <u>Conclusion</u>

The intrinsic evidence requires assigning the ordinary and customary meaning that someone skilled in the art in question at the time of invention would assign to the terms "lip" and "adjacent." See Howmedica Osteonics Corp., 822 F.3d at 1320. We find that a "lip" is "an edge, or rim, or a projection or protrusion from a surface." The term "adjacent" describes when two items are in close proximity to

one another but are not necessarily touching.  Accordingly, we find "adjacent" to mean "an object is near or next to another object, but the objects do not have to be in contact with each other."  Because the '915 Patent's intrinsic evidence (claim language, specification, prosecution history) unambiguously supports the above-described constructions, we decline to consider the parties' proffered extrinsic evidence.  See Ga.-Pac. Corp., 195 F.3d at 1332.  An appropriate order shall issue.

     /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    April 8, 2019